**IN THE COURT OF APPEALS OF IOWA**

No. 24-1328
Filed October 30, 2024

**IN THE INTEREST OF N.F., E.M., H.M., K.M., and L.T.,**
**Minor Children,**

**K.J., Mother,**
    Appellant,

**C.T., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Appanoose County, Richelle Mahaffey, Judge.

A mother and father each appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS**.

Jonathan Willier, Centerville, for appellant mother.

Lynnette M. Lindgren of Broerman, Lindgren & Denny, Ottumwa, for appellant father.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

Debra A. George of Griffing & George Law Firm, P.L.C., Centerville, attorney and guardian ad litem for minor children.

Considered by Schumacher, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

A mother appeals the termination of her parental rights to her five children under Iowa Code section 232.116(1) (2024). A father separately appeals the termination of his rights to the youngest child—both parties' son. The mother and father each argue that the State did not prove any ground for termination. The mother also argues that a guardianship was not properly considered as an alternative permanency option. And the father argues that termination was not in the best interest of his son.

We agree with the juvenile court that clear and convincing evidence supports terminating the mother and father's parental rights under Iowa Code section 232.116(1)(e) because both parents failed to maintain significant and meaningful contact with the children. Termination of the father's parental rights is in the son's best interest given the father's failure to obtain substance-use or mental-health treatment, the need for permanency in the son's life, and the son's positive foster-home environment. And we agree that guardianship is not a viable option here, especially since the mother did not propose any concrete plan for guardianship. We thus affirm on both appeals.

## I.      Factual Background and Proceedings

In September 2021, a family with four daughters—ages five, three, two, and two months—came to the attention of the Department of Health and Human Services ("HHS") with a report that the mother was using methamphetamine. The mother admitted to using—and tested positive for—methamphetamine. After receiving the test results, HHS developed a safety plan for the children to stay with the mother—she agreed to live with her aunt, have all interactions with her children

supervised by her aunt or her mother, and obtain a substance-use evaluation. At the time, the mother was romantically involved with the father in this appeal—but he is not the father to these four girls.[1]

Things did not go well with the safety plan. So a child-in-need-of-assistance petition was filed on April 29, 2022. In July 2022, the four girls were removed from their mother's custody. But around a month later, a disposition hearing was held, and the girls were returned to their mother's custody. In March 2023, HHS became aware that the mother had stopped substance-use treatment and that she was pregnant with the father's child. The mother tested positive for methamphetamine in June 2023 while she was pregnant. So the court again removed the girls from their mother's care in July 2023.

In late November 2023, the mother and father's son was born, and he tested positive for methamphetamine a few weeks later. Both parents also tested positive for methamphetamine around the same time. In January 2024, the son was placed in foster care. A month later, a permanency hearing was held for the four girls, and the mother was granted a six-month extension to work toward reunification. Still, given the continued concerns, the State petitioned to terminate the mother's parental rights to all five children and the father's rights to their son in July 2024.

Throughout this three-year period, the mother and father's substance use has continued to be an issue. While neither has tested positive for methamphetamine since December 2023, the mother has relapsed multiple times over the three years and the father has refused to test in the past. The mother has

---

[1] These four girls' father—whose parental rights were also terminated—did not participate in the proceeding and did not appeal. So we do not discuss him further.

attended extended outpatient treatment four times but has been unsuccessfully discharged each time. And her longest period of substance-use treatment was around four months. The father has, for much of the time, refused to comply with substance-use treatment and drug screens, other than a span from November 2023 to March 2024.

Both parents have turned to other substances when not using methamphetamine—the mother using alcohol and the father using marijuana and alcohol. HHS found that it is unclear whether the mother has "ever maintained total sobriety from all substances" as she has "demonstrated a behavioral pattern of replacing one substance for another" and then "resum[ing] use of methamphetamine." The father told HHS that he "uses marijuana every day all day" and has made clear to HHS that "he wants to continue engaging in the use of marijuana and not pursue [treatment] with other resources or entities that might be beneficial for him instead of use of marijuana." The father's marijuana use has caused safety and financial problems too—drug paraphernalia and marijuana wax containers were found around the home the children reside in, and he spends roughly $200 per week on marijuana.

Neither parent has fully used and cooperated with HHS services over the three years. There have been seven different safety plans, which both parents have failed to follow. Both parents have failed to fully use mental health services, even though they have both acknowledged struggling with mental health in the past. Indeed, the mother told HHS that her mental health is what causes her to relapse. But despite obtaining three mental health evaluations, the mother has followed through with recommended treatment only once from January 2024 to

March 2024. And the father obtained one mental health evaluation in March 2024, but he never followed through with the recommended treatment.

Both parents have struggled with being truthful with HHS. The father told HHS after his first mental health evaluation that the provider did not recommend any treatment, which was false. In fact, the provider recommended that he participate in therapy weekly or at a minimum every other week. The mother told HHS that she had reported alcohol use to her substance-use-treatment provider, which was also false. Her provider told HHS, "[d]rinking was not even spoken about during any of our sessions . . . . I believe [the mother and father] are being very manipulative and dishonest." In April 2024, both parents reported to HHS that they were attending all their scheduled substance-use-treatment appointments, which was false—the provider had put them as a "sit and wait status" for lack of attendance. And the children reported that their mother told them that they should not tell HHS that the father had been staying with them, that the only reason that they could not come home was that HHS and "the cops" want to keep them away from her, and that they should not talk to those "dangerous people."

The four older girls are now living with their aunt and her husband and are doing well in their care. HHS found "[t]he children are on track developmental[ly], their behaviors have decrease[d] and all of them have done well in school without behaviors." The aunt has expressed that they are willing to adopt the girls if that option becomes available. The son is also residing with a foster family who is willing to adopt him if that becomes possible. Both HHS and the guardian ad litem recommended that the court terminate the mother's and father's parental rights.

In August 2024, the juvenile court held a combined permanency hearing for the then-eighth-month-old son and a termination hearing for the son and the four older girls, who were then eight, six, five, and three. As for the permanency hearing, the court found that returning the son to the custody of his parents was not appropriate. It explained "neither parent has made enough progress to place themselves in a position to have [their son] returned to their care. The evidence also does not support that [their son] could be returned to either parent in the foreseeable future." The court acknowledged that guardianship was one permanency option under the statute and that "[t]ermination and adoption are the preferred methods of obtaining permanency for a child who cannot be returned to a parental home." And it reasoned that "[t]he record here shows termination and adoption are the only permanency options available [and] appropriate" to give their son "the sort of permanent, safe and nurturing home the child needs and deserves."

The court also found that the State proved grounds for termination under paragraphs "d," "e," "h," and "l" of section 232.116(1) for both parents' rights to the son and for the mother's rights to the youngest girl, and under paragraphs "d," "e," and "l" for the mother's rights to the three oldest children. The court also found that it was in the best interest of all of the children for the parents' parental rights to be terminated. The court explained that based on the record "[n]one of the children can be safely returned to any parent today, or in the foreseeable future." And "[t]he children are thriving in their current respective placements." Finally, the court found no exception to termination of parental rights under Iowa Code section 232.116(3) applied. The mother and father now separately appeal.

## II.      Grounds for Termination under Section 232.116(1)(e)

Terminating parental rights under chapter 232 follows a three-step process. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).  The State must first prove by clear and convincing evidence that a statutory ground for termination exists.  *Id.*  Next, the State must similarly show that termination is in the child's best interest.  *Id.*  And third, the parent has the burden to show whether a permissive exception precludes termination.  *Id.*  We review each of these steps de novo, giving appropriate weight to the juvenile court's preferred fact-finding position, particularly giving "respectful consideration" to its "credibility determinations."  *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021).

The mother and father both argue that the State did not meet its first-step burden to prove a statutory ground that supports terminating their parental rights. The juvenile court, in a thoughtful opinion, found that multiple grounds supported terminating the parents' rights to the children.  When a juvenile court terminates parental rights on multiple statutory grounds, we only need to find that one of them supports termination.  *See In re L.H.*, 949 N.W.2d 268, 270 (Iowa Ct. App 2020). So we will consider whether the evidence meets the requirements of section 232.116(1)(e) because the court found that this ground applies to all the children.

Iowa Code section 232.116(1)(e) has three requirements.  First, the child must be "adjudicated a child in need of assistance."  Iowa Code § 232.116(1)(e)(1). Next, the child must have "been removed from the physical custody of the child's parents for a period of at least six consecutive months."  *Id.* § 232.116(1)(e)(2). And third, there must be "clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous

six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so." *Id.* § 232.116(1)(e)(3); *see also In re T.S.*, 868 N.W.2d 425, 437 (Iowa Ct. App. 2015) (noting that subparagraph three has two requirements: significant and meaningful contact and reasonable efforts). The statute defines "significant and meaningful contact" as "the affirmative assumption by the parents of the duties encompassed by the role of being a parent." Iowa Code § 232.116(1)(e)(3). This duty includes, but is not limited to, "financial obligations, . . . continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and . . . establish[ing] and maintain[ing] a place of importance in the child's life." *Id.* The contact and efforts elements are "separately required, but they are considered closely interconnected." *T.S.*, 868 N.W.2d at 437.

Neither the father nor the mother disputes that at the time of the termination hearing, the children had been adjudicated in need of assistance and had been removed from their physical custody for a period of six consecutive months. But both challenge the third prong of section 232.116(e), disputing whether the State proved by clear and convincing evidence that they failed to maintain significant and meaningful contact with the children. The father argues he has "been having regular visits with the [son]" and reports that he has been "extremely attentive and actively participating" in the caretaking of the son. The mother argues that she too was "having regular visits with the children" and the visits were going "well." Both parents also assert they were not given the chance to resume care of the children.

As for visitation, both the mother and father have been mostly attending their scheduled supervised visits, with more consistency since February 2024. There was testimony that these visits were "going better" and that they each interact with the children during the visits. But besides the scheduled visits, there does not seem to be any other effort to communicate with the children or spend time with the children. The aunt who currently has the four girls has encouraged the mother to call whenever, but the mother has only done so thirteen times between October 2023 and August 2024—about once a month. And the aunt has also offered for the mother to visit the girls any time she would like. But the mother has only twice pursued an unscheduled visit, mainly because the aunt has said that the father is not allowed to come with her. And the mother recently declined to stay with the aunt and girls for a multi-day visit to celebrate one of the girl's birthdays during an unscheduled time. This all would have been valuable time for the parents to interact with the children, but they prioritized their relationship with each other and their drug use over the children.

While attending regular visits does lend support for a finding of significant and meaningful contact, this is not the only factor. *See T.S.*, 868 N.W.2d at 437 (explaining evidence of attending visits cannot be the end of the significant-and-meaningful-contacts analysis). There also must be evidence of the "affirmative assumption" of the duties that go with being a parent. *See* Iowa Code § 232.116(1)(e)(3). And that evidence is not in this record. The parents have not financially provided for the children, and the record indicates that providing financially could be a struggle for them moving forward. And, significantly, the parents have not made "a genuine effort to complete the responsibilities prescribed

in the case permanency plan." *Id.* There have been many services offered to the parents and they have failed to fully use them, especially mental health services. *See In re D.H.*, No. 18-1552, 2019 WL 156668, at *2 (Iowa Ct. App. Jan. 9, 2019) (collecting cases finding failure to seek treatment for one's mental health conditions supports termination of parental rights). Here, that is particularly concerning because their mental-health needs are linked to their substance use, yet continue to go unaddressed.

As to the mother and father's argument that they were not given the chance to "resume care" as required under Iowa Code Section 232.116(1)(e)(3), this subparagraph focuses on reasonable *efforts* to resume care—it does not require that the children be placed back in the physical care of the parents. "Any single act which might constitute a reasonable effort does not necessarily avoid termination." *In re D.W.*, No. 17-0281, 2017 WL 1735934, at *3 (Iowa Ct. App. May 3, 2017) (cleaned up). And we must look at the substance of the parent's conduct, not just the form. *Id.* The evidence of not following their case plans, not utilizing unscheduled visits, and continuing to use impairing substances does not show reasonable efforts to resume care of the children. Thus, we agree that the mother and father did not maintain significant and meaningful contact with the children and have made insufficient efforts to resume care despite being given chances to do so.

True, both parents have made some positive steps in the last few months. But those steps "do not eliminate [their] past." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (en banc). The problems that led to the children's removal are significant and, after three years, largely still unresolved. *Id.* "[T]he crucial days

of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *Id.* (cleaned up). As the juvenile court found, "[t]he record is replete with evidence that offering more time and services to the parents is unlikely to lead to substantive change." We thus agree with the juvenile court that there is clear and convincing evidence that termination of parental rights is appropriate under Iowa Code section 232.116(1)(e).

### III.     Best Interest Challenge by the Father

The father challenges the second step—whether it is in the best interest of the son to terminate the father's parental rights. The State argues that the father failed to preserve error on this issue because the father did not testify or call any witnesses at the termination hearing and his closing argument did not mention the son's best interest. It is questionable whether the father preserved this issue for appellate review. *Compare In re M.F.*, No. 18-0289, 2018 WL 3057772, at *1 & n.2 (Iowa Ct. App. June 20, 2018) (holding that the parent waived or did not preserve error by only cross-examining the State's witness and not introducing her own evidence or objecting to the any of the State's exhibits), *with In re A.R.,* 316 N.W.2d 887, 888–89 (Iowa 1982) (holding parent may challenge sufficiency of the evidence for statutory ground of termination on appeal when issue was not raised in the district court). But even if generally resisting termination at the hearing was enough to obtain appellate review, we agree that terminating the father's parental rights is in the son's best interest.

The best interest of the child is the "paramount concern in a termination proceeding." *In re L.B.,* 970 N.W.2d at 313. We consider both the son's long-range and immediate best interests. *See In re C.K.,* 558 N.W.2d 170, 172 (Iowa

1997). And we must "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The father argues that there was "no evidence provided by the state that maintaining contact with [his son] would be detrimental to the [son's] mental health or safety," and "[t]here was no evidence to suggest that [the son was] not closely bonded with his father." And the father contends that he has "made significant progress" and he "should be allowed to maintain his parental rights in order to maintain that bond." But none of these arguments overcomes the weight of evidence showing that termination of the father's parental rights is in the best interest of the son.

The father has failed to consistently participate in substance-use or mental-health treatment or any of the other services offered to him by HHS. Rather, he has continued to use illegal marijuana to cope with his mental health problems. Marijuana still impairs a person's judgment. As the HHS worker testified, marijuana "blocks his ability to parent his [son]." And just because a person has stopped using methamphetamine, it does not mean that their "severe, chronic substance abuse problem" is cured when they are still using alcohol and marijuana. *See In re K.A.*, No. 02-1925, 2003 WL 183994, at * 2 (Iowa Ct. App. Jan. 29, 2003). We cannot conclude that because the father has recently stopped using methamphetamine, that now it is in his son's best interest for him to be around marijuana and alcohol. As the juvenile court reasoned, we have "nearly

three years of [the father's] past performance to consider when attempting to predict [his] future abilities to be [a] safe and sober caregiver[]."

While it is commendable that the father has maintained more stable employment and stopped using methamphetamine, that is not enough to grant his request "for a chance to continue to be his child's father." He was given many chances to put his son's safety first, but he failed to take them. Meanwhile, the son is doing well in a stable foster-home interested in giving him permanency through adoption. It is in the son's best interest for the father's parental rights to be terminated.

## IV.    Guardianship Challenge by the Mother

The mother challenges whether the juvenile court properly considered guardianship as an alternative permanency option. In making her argument, the mother only asserts that the State and the juvenile court "did not look beyond the children's ages at the individual circumstances of the case in ruling out guardianship." But the juvenile court's order does not state that it relied on only the children's ages. What's more, the mother points to no other evidence that would make guardianship the better permanency alternative.

"[A] guardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018) (cleaned up). This is because over the life of the guardianship—potentially until the children turn eighteen—the court could terminate the guardianship or change the guardian at the mother's request or on its own motion. *See id.* at 477–78. It sets up potential conflict between the guardian and the mother. So it often does not "achieve permanency" and stability. *Id.* at 478 (cleaned up). Iowa Code section 232.104 does allow for guardianship

as a permanency option, but it requires "a judicial determination that [such a] planned permanent living arrangement is the best permanency plan for the child." Iowa Code § 232.104(3)(a).

"Determining the best permanency plan for a child is a best-interests assessment." *In re A.M.*, No. 20-1008, 2020 WL 7021576, at *3 (Iowa Ct. App. Nov. 30, 2020). At the hearing, the HHS worker testified that they determined guardianship was not suitable "given the history of this case and the kids' ages." And the mother presented no concrete plans for potential guardians for the children.

We do not doubt that the mother and children love each other. But these children deserve permanency, and they have waited too long to receive it. The history of short-term sobriety then relapse, failure to take advantage of the services offered, and the lack of honesty with HHS weighs against the mother's visitation and seven-month sobriety from methamphetamine. It is in the children's physical, mental, and emotional best interest to terminate parental rights rather than place the children in a guardianship.

**AFFIRMED ON BOTH APPEALS**.